# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CHARLIE WOODY, on behalf of the INSULATORS AND ALLIED WORKERS LOCAL NO. 46 ANNUITY FUND,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 3:19-cv-01018** **Judge Aleta A. Trauger** |
| **USA DEBUSK, LLC and G&A ENVIRONMENTAL CONTRACTORS, LLC,** | ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 21) filed by defendants USA DeBusk, LLC ("DeBusk") and G&A Environmental Contractors, LLC ("G&A") (collectively, "defendants"), seeking judgment in their favor against the plaintiff, Charlie Woody, on behalf of the Insulators and Allied Workers Local No. 46 Annuity Fund ("Fund" or "Annuity Fund"). For the reasons set forth herein, the motion will be denied.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The Annuity Fund brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), in particular 29 U.S.C. § 1145, to recover employer contributions owed to the Fund. (Compl., Doc. No. 1 ¶ 1.) Charlie Woody is a trustee of the Board of Trustees of the Annuity Fund and, in that capacity, a fiduciary of the Fund, as defined by 29 U.S.C. § 1002(21). (*See* Doc. No. 1 ¶ 4.)

As set forth in the Complaint, the Fund is funded primarily by contributions remitted by

multiple participating employers, pursuant to negotiated collective bargaining agreements with the Insulators and Allied Workers Local No. 46 ("Local 46"). (*Id.* ¶ 8.) Participating employers identify the employees for whom contributions are owed and the number of hours worked by the covered employees; they then submit payments to the fund based on the hours reported. (*Id.* ¶ 9.)

Non-party Wrap It Up Construction, LLC ("WIU"), a now-defunct Tennessee limited liability company, was party to a collective bargaining agreement ("CBA") with Local 46 that required it to make contributions to the Fund on behalf of its covered employees. WIU was in breach of the CBA and other governing Fund documents from August 2017 through January 2018, as a result of its failure to remit monthly contributions to the Fund for work performed by covered employees during that time. (*Id.* ¶¶ 10–12.)[1] The defendants began paying contributions to the Fund in February 2018 on behalf of WIU's covered employees. (*Id.* ¶ 14.)

DeBusk entered into an Asset Purchase Agreement ("APA") with WIU in January 2018. (*See* APA, Doc. No. 24-1. at 7–11.) The plaintiff alleges that, pursuant to the APA, DeBusk purchased substantially all of WIU's assets, including WIU's name and the goodwill associated with it, and then stepped into WIU's shoes, employing its employees and performing work for its customers, in what amounted to a *de facto* merger. (Doc. No. 1 ¶¶ 15–27.) The Fund also alleges that DeBusk had notice of the Fund's claims for unpaid contributions at the time it entered into the APA and that there was "substantial continuity in the operations of [WIU's] business before and after the Asset Transfer," as a result of which the defendants are liable for the amounts WIU failed to submit to the Fund from August 2017 through January 2018. (*Id.* ¶¶ 28, 29.)

---

[1] The plaintiff does not characterize this failure as a complete or partial "withdrawal" under 29 U.S.C. § 1383 or § 1385, and it is not entirely clear from the plaintiff's allegations whether the statutory criteria for "withdrawal" were met or whether, instead, WIU simply failed to meet all of its contribution obligations under the CBA.

The defendants' Motion for Summary Judgment is premised entirely on the argument that they are not subject to "successor liability" under the applicable law. While their materiality remains to be established, the statements set forth in their Statement of Undisputed Material Facts in support of their motion are basically undisputed for purposes of the Motion for Summary Judgment.

As established by the plaintiff's Response to the Defendants' Statement of Undisputed Facts (Doc. No. 30), DeBusk is a Texas limited liability company with offices in multiple states throughout the United States, as well as in Canada and Mexico. It primarily provides industrial maintenance and cleaning services to clients in the energy industry. (Doc. No. 30 ¶ 1.) G&A is a wholly owned subsidiary of DeBusk, with a principal place of business in McEwen, Tennessee. (*Id.* ¶ 2.)

In August 2017, DeBusk opened an office in Oak Ridge, Tennessee, with the intention of developing business on "large projects with the governmental agencies and contractors in the region." (*Id.* ¶ 4.) From August through November 2017, DeBusk Division Manager Esley Hall, manager of the Oak Ridge office, met several times with Anthony Poteet, owner of WIU. Among other things, they discussed "Mr. Poteet's ability to acquire larger projects" and the possibility that Poteet might work for DeBusk. (*Id.* ¶ 5.) According to Hall, Poteet never stated during these discussions, and never furnished any information showing, that WIU was delinquent in the payment of "any union or union-related contributions," and he never otherwise mentioned unpaid liabilities of WIU. (*Id.* ¶¶ 7–9.) Poteet never furnished to Hall WIU's accounting books or records or complete financial statements for the company. (*Id.* ¶ 10.)

In December 2017, Hall and Poteet first began discussing the possibility of DeBusk's purchasing "certain tangible assets" from WIU, "including vehicles, trailers, equipment and tools."

(*Id.* ¶ 11.) Poteet provided Hall with a list of assets and a proposed price; Hall inspected the assets and determined that the quoted price was fair. DeBusk and WIU then entered into the APA, dated January 22, 2018. (*Id.* ¶¶ 11–12.) The list of tangible assets conveyed by the APA is attached to it as Schedule 1.1. (*See* Doc. No. 24-1, at 10–11.) According to Hall, DeBusk did not purchase all of WIU's assets—specifically, it did not purchase its accounts receivable or cash accounts. (Doc. No. 30 ¶ 13.) As the plaintiff points out, however, the APA specifically provides that, as part of the deal, WIU conveyed to DeBusk "the right to use the name 'Wrap It Up' or any variation of the same." (APA Art. 1.1, Doc. No. 24-1, at 7.)[2]

On January 17, 2018, prior to entering into the APA, DeBusk extended an offer of employment to Poteet, which Poteet accepted, effective "[a]bout a week after entering into the APA." (*See* Offer Letter, Doc. No. 29-1; Hall Decl., Doc. No. 24-1 ¶ 15.) The letter provides that Poteet's title would be "Manager," and he would be responsible for selling "Insulation Related Services"; his "service line/division" would operate under DeBusk's "union subsidiary G&A," and would "be known as 'Wrap It Up DeBusk, a division of USA DeBusk LLC.'" (Doc. No. 29-1, at 1.) He was expected to "make any and all introductions to help drive industrial cleaning sales." (*Id.*)

Poteet worked for G&A from January 31, 2018 until April 4, 2018. He was never an officer or director of G&A and never acquired any ownership interest in G&A. The Offer Letter recognized that he would be required to complete "outstanding work with [his] previous employer"—*i.e.*, WIU—during a "Transition Period" but that, upon completion of the "Transition

---

[2] This court's Local Rules require that, if a non-moving party disputes any fact set forth in the moving party's statement of undisputed material facts, he must "demonstrate[e] that the fact is disputed" with a "specific citation to the record." L.R. 56.01(c)(3). The plaintiff did not comply with this Rule, but nonetheless supplied documents to which it cites in its Response to the Motion for Summary Judgment.

Period," he would be expected to devote his full time to the defendants. (Doc. No. 29-1, at 1.) The Offer Letter does not define the length of the Transition Period.

According to the defendants, G&A performed services for WIU on four projects in or around Knoxville, Tennessee from February through April 2018. G&A invoiced WIU for these services, but the invoices, totaling more than $400,000, were never paid. (*See* Schreiber Decl., Doc. No. 24-2 ¶ 9.) The plaintiff disputes that G&A "performed services for" WIU, since, as the Fund claims, "Defendants merged with WIU to form a new entity, which entity performed the work." (Doc. No. 30, Resp. to ¶ 22.) The plaintiff's statement is not supported by reference to any citation to the evidentiary record, but the Fund presumably is referencing the new division created when Poteet was employed, Wrap It Up DeBusk, a division of USA DeBusk LLC.

During his employment by the defendants, Poteet brought in only a small amount of business, and the defendants lost money on the projects he did bring in. (Doc. No. 30 ¶ 23.) G&A paid Poteet the compensation he was due for the work he performed during the few months he was employed by it, totaling about $11,815.00. (*Id.* ¶ 25.) The defendants claim that the assets purchased from WIU did not generate any "net profits." (*Id.* ¶¶ 26–27.)

DeBusk did not take into consideration any potential prior liabilities of WIU in considering the price for the assets purchased under the APA, and it paid fair market value for the assets it did purchase. (*Id.* ¶ 28.)

Prior to closing on the APA, DeBusk and G&A were never told that WIU owed money to the Fund and never received actual notice of any debt owed by WIU to the Fund. DeBusk and G&A received no documents from the Fund, Poteet, WIU, or anyone else before the closing of the APA that described, reflected or showed any liability owed by WIU to the Fund. Neither Poteet nor WIU ever furnished DeBusk or G&A any financial statements or reports for WIU that showed

any debt to the Fund. DeBusk and G&A were never furnished the complete accounting books and records of WIU. (*Id.* ¶ 29.)

On January 31, 2018, outstanding delinquency owed to the Fund by WIU was less than $76,000. (*Id.* ¶ 31.) The defendants assert that WIU continued to receive substantial income after closing on the APA, as reflected by deposits into its bank account from January 2018 through May 2018. (*Id.* ¶ 32; *see* Bank Statements, Doc. No. 24-3.) Without citing any actual evidence, the plaintiff purports to dispute this statement, asserting that "WIU ceased to be an active entity in February 2018, was administratively dissolved by the Secretary of State shortly thereafter, and continued to receive monies from some customers only as a pass through entity to Defendants and, therefore, received no 'income.'" (Doc. No. 30, Response to ¶ 32.)

By August of 2018, WIU had declared bankruptcy. According to its bankruptcy Schedule A/B, it had outstanding accounts receivable totaling more than $250,000 at that time. (Doc. No. 30 ¶ 34.) No evidence in the record indicates the total of its liabilities.

The Fund filed suit in November 2019. The defendants filed their Motion for Summary Judgment, supporting Memorandum, Statement of Undisputed Facts, and supporting evidentiary material in September 2020. (Doc. Nos. 21–24.) The time for the plaintiff to respond was extended to permit the parties to engage in mediation, which was unsuccessful. The plaintiff has now filed its Response, Response to the Statement of Undisputed Facts, and the Declaration of counsel, to which was appended the documentary evidence referenced herein. (Doc. Nos. 28–30.) The defendants filed a Reply. (Doc. No. 33.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Trans. Co.*, 446 F.3d 637, 640 (6th Cir. 2006). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. A party asserting that a fact is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record . . . or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). If a party fails to properly support an assertion of fact, the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).[3]

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to permit it to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## III.    DISCUSSION

### A.     Federal Common Law Governs Successor Liability in ERISA Cases

The Fund seeks to hold the defendants liable for WIU's delinquent obligations based on a theory of successor liability. The defendants argue, first, that the court should look to state law to determine successor liability and that, under Tennessee law, there is no basis for successor liability. They also argue that the APA provides that Texas law should govern its construction and that Texas law is even more hostile than Tennessee law to the concept of successor liability. The

---

[3] The evidence on which the parties rely does not need to be in admissible form. However, parties "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The defendants object to the plaintiff's evidentiary material on the grounds that it is unauthenticated and includes hearsay communications. (*See* Doc. No. 33, at 2.) The defendants, however, do not contend that the material *cannot* be presented in admissible form. The objection, therefore, is without merit.

defendants acknowledge the Sixth Circuit's recent opinion applying federal common law to a successor liability claim in an ERISA case—specifically, an MPPAA case involving withdrawal liability. *See Pension Benefit Guaranty Corp. v. Findlay Indus., Inc.*, 902 F.3d 597 (6th Cir. 2018), *cert. dismissed sub nom Sept. Ends Co. v. Pension Ben. Guar. Corp*., No. 18-1265, 2019 WL 1455808 (U.S. Aug. 2, 2019). The defendants, however, construe *Findlay* as holding that the federal common law standard should apply in ERISA cases only in certain limited circumstances. The plaintiff argues that the federal common law applies.

The language in *Findlay* is somewhat equivocal about whether the federal common law *always* applies to the question of successor liability for unfunded pension liabilities under ERISA. The court noted that "[t]he district court was correct to reason that the creation of common law under ERISA is something to be done in narrow circumstances" but that, "because the federal-common-law doctrine of successor liability serves fundamental ERISA policies, . . . the creation and application of federal common law is appropriate *in this case*." *Id.* at 609 (emphasis added); *see id.* at 610 ("[T]he federal common law of successor liability is necessary to promote fundamental ERISA policies *in this case*." (emphasis added)).

The court, however, was not distinguishing between federal common law and state common law, but between the statutory scheme itself and federal common law. *See id.* at 609 ("[The plaintiff does not contend that the transfer of Findlay assets to Michael and his companies made Michael or his companies liable under 29 U.S.C. § 1369(b), the section of ERISA that asserts liability for certain corporate reorganizations. Instead, PBGC asked the district court to rely on federal common law's treatment of successor liability to hold Michael and his companies accountable for Findlay's liability."). Later in the same opinion, the court rejected as unfounded the defendants' suggestion that the court should apply state common law rather than federal. *Id.* at

612. And, more generally, the court appeared to embrace the application of federal common law

generally to successor liability cases involving unpaid ERISA obligations:

> ERISA's broad preemption provision makes it clear that Congress intended to establish employee benefit plan regulation as an exclusive federal concern, with federal law to apply exclusively, even where ERISA itself furnishes no answer. . . . [A]s a general matter, the court must look to the federal common law and should draw guidance from state common law only when federal common law does not provide an established standard.

> Because there is a body of federal common law applying successor liability in employment and labor cases, it is appropriate to apply that law here, too. Successor liability is an equitable doctrine that requires the court to balance (1) the interests of the defendant, (2) the interests of the plaintiff, and (3) the goals of federal policy, in light of the particular facts of a case and the particular legal obligation at issue.

> Furthermore, adopting the federal common law of successor liability would best serve ERISA's purposes. "ERISA's goal, [the Supreme] Court has emphasized, is uniform national treatment of pension benefits." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 17 (2004) (internal quotation marks and citation omitted). By applying the federal common law of successor liability, this court also will align itself with the Seventh and the Ninth Circuits, both of which have done so in MPPAA cases.

*Id.* at 611–12 (citing *Resilient Floor Covering Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering*, 801 F.3d 1079, 1095 (9th Cir. 2015); *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture*, 920 F.2d 1323, 1327 (7th Cir. 1990)) (most internal quotation marks and other internal citations omitted). Consequently, consistently with other district courts in this circuit, the court construes *Findlay* as "adopting 'the federal common law of successor liability' in a case under the MPPAA.'" *Members of Bd. of Admin. of Toledo Area Indus. UAW Ret. Income Plan v. OBZ, Inc.*, 348 F. Supp. 3d 635, 643 (N.D. Ohio 2018) (quoting *Findlay*, 902 F.3d at 611); *see also Sofco Erectors, Inc. v. Trs. of Ohio, Operating Eng'rs, Pension Fund*, No. 2:19-CV-2238, 2020 WL 2541970, at *10 (S.D. Ohio May 19, 2020) (relying on *Findlay* in support of the application of successor liability in an ERISA withdrawal case). Moreover, "federal courts across the country"—and within this circuit—"have applied the successor-liability rule in ERISA cases

involving a predecessor's delinquent contributions to a multiemployer plan as well as its withdrawal liability." *OBZ, Inc.*, 348 F. Supp. 3d at 643 (citation omitted).

The court therefore rejects the defendants' contention that state law of successor liability—whether Tennessee or Texas law—applies in the context presented here and will apply federal common law of successor liability instead.

**B.    Application of Federal Common Law in this Case**

"The successorship doctrine provides an exception from the general rule that a purchaser of assets does not acquire a seller's liabilities." *Chicago Truck Drivers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995) (citation omitted). While most states have adopted exceptions to the general rule, thus allowing creditors to pursue a successor for the predecessor's liabilities if the "'sale' is merely a merger or some other type of corporate reorganization that leaves real ownership unchanged[,] . . . [s]uccessor liability under federal common law is broader still." *Id.*

Although the Sixth Circuit, in *Findlay*, did not actually identify the standard to be applied,[4] those federal courts that have considered the question in the ERISA context have uniformly held that successor liability "allows lawsuits against even a genuinely distinct purchaser of a business," so long as "(1) the successor had notice of the claim before the acquisition; and (2) there was substantial continuity in the operation of the business before and after the sale." *Id.*; *see also Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 845 (7th Cir. 2015); *Michael's Floor Covering*, 801 F.3d at 1095; *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 99 (3d Cir. 2011); *Artistic Furniture*, 920 F.2d at 1327; *Sofco Erectors*, 2020 WL 2541970, at *10; *OBZ, Inc.*, 348 F. Supp. 3d at 643.

Courts also recognize that "successor liability is an equitable doctrine, not an inflexible command, and in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance

---

[4] In *Findlay*, the Sixth Circuit simply held that federal common law should be applied in that case. *See Findlay*, 902 F.3d at 611 ("In choosing the form of successor liability to apply in this case, we opt for the test developed under different provisions of federal labor and employment law."). It reversed the district court's Rule 12(b)(6) dismissal of the complaint and remanded for further proceedings, rather than articulating or applying that test itself.

as to its resolution, emphasis on the facts of each case as it arises is especially appropriate." *Tsareff*, 794 F.3d at 849 (quoting *Tasemki*n, Inc., 59 F.3d at 49) (internal quotation marks omitted); *see also Michael's Floor Covering*, 801 F.3d at 1093 ("The successorship standards are flexible and must be tailored to the circumstances at hand.").

### 1. *Substantial Continuity*

In considering whether substantial continuity exists, courts look to a non-exhaustive list of factors including "continuity of the workforce, management, equipment and location; completion of work orders begun by the predecessor; and constancy of customers." *Einhorn*, 632 F.3d at 99 (citing *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987); *Artistic Furniture*, 920 F.2d at 1329); *see also OBZ, Inc.*, 348 F. Supp. 3d at 647.

The defendants argue that the transaction took place at arms length and that, under the terms of the APA, DeBusk simply purchased the items enumerated on the accompanying schedule for fair market value. While the defendants' Memorandum in support of the Motion for Summary Judgment does not focus on the standards to be applied under the federal common law of successorship in the context of ERISA non-contribution claims, the defendants also contend that WIU continued to conduct business after the transaction. They offer no evidence to support this assertion other than pointing to bank account records showing deposits in excess of $700,000 from February through May 2018 (and debits totaling more than $800,000). (Doc. No. 24-3.) They also argue that the plaintiff originally sued WIU but now pursues the defendants in this lawsuit only because WIU filed for bankruptcy protection. (Doc. No. 23, at 9–10.)

The plaintiff, in response, argues that the defendants have not put forth "undisputed facts" as to this element. (Doc. No. 28, at 4.) And it points to circumstantial evidence in the record that, it posits, establishes substantial continuity. Specifically, the Fund notes that WIU stopped making required contributions to the Fund the same month that Poteet entered into discussions with Esley

Hall. (Doc. No. 24-4, at 13.) In December 2017, DeBusk offered Poteet a consulting agreement (Doc. 29-2, at 6) and, in concert with execution of the APA, offered him full-time employment as the Manager of the newly formed WIU division of DeBusk. (*See* Offer Letter, Doc. No. 29-1, at 1.) The plaintiff also points to evidence suggesting that, after closing on the APA, the defendants immediately began the onboarding process for hiring WIU employees. (*See* Doc. No. 29-1, at 4–10 (onboarding documentation for one former WIU employee effective Feb. 1, 2018); *see also* Doc. No. 29-2, at 13–18 (email exchanges between WIU and DeBusk concerning the Social Security and Driver's License numbers and other information for WIU employees going to work for DeBusk); Doc. No. 29-3 (documents indicating that WIU had 26 unionized employees in January 2018 and that the majority of them were employed by G&A as of March and April 2018).) The Fund asserts that the defendants "then began performing work on all or most of WIU's existing contracts, negotiating directly with WIU's customers." (Doc. No. 28, at 5 (citing Doc. No. 29-1, at 18–19 (email from T. Kennedy, DeBusk General Manager, to a former WIU customer); Doc. No. 29-2, at 7–12 (email exchanges indicating customer contracts with WIU were being transferred to the newly formed WIU division of DeBusk); Answer, Doc. No. 10 ¶ 19 ("[I]t is admitted that G&A Contractors employed some employees that were previously employed by WIU and that G&A Contractors used those employees to perform subcontract work on some projects on which WIU was contracted to perform work.").).)

The plaintiff also contends that the defendants purchased nearly all of WIU's assets, along with the goodwill associated with them and the unqualified right to use the name "Wrap It Up." Neither party actually points to any evidence regarding what assets WIU retained, but WIU's Schedule A/B indicates that, as of August 2018, WIU retained almost no tangible assets. (*See* Doc. No. 24-5, at 2–3 (identifying the assets in its possession as including two metal desks,

miscellaneous tables and ladders, "old electric cement mixer," and motorized compactor, collectively valued at $1,700).)[5] Finally, the plaintiff asserts that WIU effectively ceased to exist on February 1, 2018. The Fund does not actually point to any evidence in the record to support that assertion, but the court nonetheless finds that evidence that G&A hired Poteet and a substantial number of WIU's other employees and assumed work for WIU's customers gives rise to an inference that WIU effectively ceased doing business upon closure of the APA. The Fund also claims that, although WIU ceased doing business, the defendants used its existing accounts as a "pass through to receive payments on WIU's contracts." (Doc. No. 28, at 5 (citing Doc. No. 29-1, at 11–16.) It does not explain the documents it cites, but they appear to be invoices issued by WIU to two of its customers that were then reissued by DeBusk to WIU with instructions to remit payment to DeBusk's address in Texas. (*See id.*) The plaintiff contends from all of this that the defendants "acquired all or substantially all of WIU's assets, customers, and employees, including its key employee, Mr. Poteet." (Doc. No. 28, at 5.)

The court finds that the plaintiff's evidence is somewhat inconclusive, particularly because the Fund makes no effort to explain or contextualize the documents its has submitted, nor has it provided any declarations or deposition testimony actually drawing the necessary inferences from the documents. At the same time, the defendants' evidence does not refute the inferences that can reasonably be drawn from the plaintiff's documentary evidence. Contrary to the assertions in their reply brief, the defendants have not established, as a matter of undisputed fact, that WIU actually continued operations after DeBusk purchased its assets. Moreover, it is not clear that the brevity of the continued relationship between DeBusk and Poteet, or between G&A and the former WIU

---

[5] The same Schedule shows $250,059.79 in accounts receivable, none of which is designated as doubtful or uncollectible (Doc. No. 24-5, at 1–2), but there is no indication in the record regarding the total of WIU's outstanding debts at the time.

employees, is material, given the documentary evidence suggesting that the parties intended the relationships to be more enduring.

In sum, the court finds that there is a material factual dispute as to the existence of substantial continuity in the operation of WIU, through the defendants, before and after the sale of assets.

### 2. Notice

Even assuming, for purposes of summary judgment, that there was substantial continuity, the defendants cannot be liable for WIU's delinquent contributions to the Fund without also having had notice of the liability prior to acquiring WIU. The defendants' witnesses, Esley Hall and Susan Schreiber, submitted Declarations in which they attest that DeBusk and G&A never received actual notice of any obligation owed by WIU to the Fund prior to the APA. Hall states that Poteet never told him that WIU was delinquent in its Fund obligations, never furnished information showing that WIU was delinquent, never mentioned WIU's unpaid liabilities, and did not furnish the accounting books and records of WIU or the company's complete financial statements. (Hall Decl. ¶¶ 7–10.) Schreiber states that she spoke with Charlie Woody in February 2018, after the execution of the APA, about G&A's collective bargaining agreement with the Fund and told him that G&A had hired employees formerly employed by WIU, but Woody did not tell her then or during a subsequent conversation that he or the Fund considered G&A to be liable for WIU's unpaid Fund obligations. (Schreiber Decl. ¶ 13.) She also attests that, prior to February 2018, neither Poteet nor anyone else ever informed her that WIU owed anything to the Fund. (*Id.* ¶ 14.) She corroborates Hall's testimony that G&A never received notice of any debt WIU owed to the fund and never received financial statements or books and records, or any other documents or information, reflecting liability owed by WIU to the Fund. (*Id.*)

The plaintiff argues that, although there is no evidence of direct knowledge, constructive

knowledge is sufficient to establish liability. It also argues that there is a material factual dispute as to whether the defendants had constructive notice of WIU's outstanding obligations to the Fund, on the basis that the defendants "knew that they were acquiring a unionized company" and even met with union officials and entered into an agreement with the Local 46 "in anticipation of the merger," so that the "new company could continue WIU's contracts with the same unionized workforce." (Doc. No. 28, at 7–8.) That is, the defendants "were familiar with multiemployer benefit funds and understood the obligations they were taking on when they acquired WIU" (*id.* at 8) and, as a result, incurred an affirmative obligation to inquire about whether WIU was current in its contributions to the Fund at the time of closing on the APA.

The court finds, first, that constructive notice may be sufficient to establish successor liability, for the reasons set forth in *Heavenly Hana LLC v. Hotel Union & Hotel Industry of Hawaii Pension Plan*, 891 F.3d 839 (9th Cir. 2018). There, the Ninth Circuit concluded that "congressional purpose, the liberal remedial construction of the MPPAA adopted in previous cases, the adoption of a constructive notice standard in other contexts, and the practical realities of asset purchases all support a conclusion that constructive notice of withdrawal liability is sufficient to trigger successor withdrawal liability under the MPPAA." *Id.* at 847; *accord OBZ, Inc.*, 348 F. Supp. 3d at 646 (adopting *Heavenly Hana*'s constructive notice standard, finding particularly persuasive "1) the court's explanation that an asset purchaser is generally in the best position to account for potential withdrawal liability during an asset sale; and 2) its conclusion that placing a minimal burden on the purchaser best serves the overriding goals of ERISA and the MPPAA: protecting the participants of employee benefit plans.").)

The question presented in this case is whether, under all the circumstances, a *reasonable* purchaser would have discovered the outstanding Fund obligations. Thus, for example, in

*Heavenly Hana*, the transaction was characterized as a simple asset purchase, but it involved the successor's taking over every aspect of the operation of the hotel previously owned and operated by the seller. The purchaser had previously operated a hotel that participated in a multiemployer pension plan and had required its agents in previous acquisitions to determine whether it might incur withdrawal liability. It knew that the hotel employees were unionized and that the predecessor hotel operator had contributed to a multiemployer pension fund. In addition, the plaintiff pension Plan's annual funding notices were publicly available on the internet and indicated a state of underfunding at the time of the transaction. Importantly, the purchaser did substantial due diligence in connection with taking over the operation of the hotel—just not on the issue of possible withdrawal liability to which it might be subject:

> [The defendant] had a four-person due diligence team undertake various investigations prior to the sale's closing. The team hire[d] engineers to . . . look at the roofs, look at the termites, look at the condition of all the structural [features] and give estimates on what it will take to fix it. As the Plan notes, [the defendant] did not rely on the seller's representation regarding termites, but surprisingly did rely on the seller's representation over a multimillion-dollar issue like withdrawal liability.

*Heavenly Hana*, 891 F.3d. at 848. Under all of these circumstances, the court held that this reliance was unreasonable as a matter of law. *Id.*

In *OBZ, Inc.*, as here, there was no dispute that the sellers did not disclose their company's ERISA withdrawal liability to the purchaser's principals or attorneys and that the relevant individuals did not actually discover the liability prior to closing on the transaction. However, it was also undisputed that documents provided to the purchasers showed that the company's workforce was unionized, that the company had made contributions to a union-sponsored pension plan, that the company had withdrawn from the plan nearly eighteen months before the sale, and that the union "Plan had not waived—and was thus maintaining its right to collect—'any withdrawal liability that may be determined and imposed in the future' by the Plan." *OBZ, Inc.*,

348 F. Supp. 3d at 644. The court concluded that, "[f]aced with this evidence relating to potential withdrawal liability, a reasonable purchaser would take additional steps to determine, if it did not already know, what withdrawal liability was and the extent of any such liability." *Id.*[6]

The court acknowledged that the evidence of constructive notice was not as strong as that in *Heavenly Hana*, particularly because, in the Ninth Circuit case, the purchaser "previously operated a hotel that participated in a multiemployer pension plan, and, in prior acquisitions involving multiemployer pension plans, [the purchaser] had required its agents to determine whether it could incur withdrawal liability from the transactions." *OBZ, Inc.*, 348 F. Supp. at 645 (quoting *Heavenly Hana*, 891 F.3d at 847). But it also concluded that the facts were not so dissimilar: in both, the purchasers were in possession of documentation establishing that "the employees at [the predecessor] were unionized and that [the purchaser] had contributed to a multiemployer pension plan." *Id.* (quoting *Heavenly Hana*, 891 F.3d at 847). Moreover, even though the purchaser in *OBZ* "lacked prior experience with multiemployer plans and familiarity with withdrawal liability," the court concluded that the fact that "its attorney undertook to discover what withdrawal liability was and at least considered whether it could transfer to [the purchaser]" permitted only "one reasonable conclusion: [the purchaser] had constructive notice of [the predecessor's] withdrawal liability." *Id.*

However, as recognized in both *Heavenly Hana* and *OBZ, Inc.*, "a purchaser that knows . . . only that the seller was a party to a collective bargaining agreement is not on constructive

---

[6] The court acknowledged that the attorney had actually done that, by speaking with an ERISA specialist at his firm, who supposedly told him there was nothing to worry about. The court found that this effort corroborated its conclusion that the defendant had constructive notice: "That he did so tends to confirm that a reasonable purchaser would . . . try to determine whether [the company] had any withdrawal liability. That [the attorney's] colleague may have given him incomplete, inaccurate, or incorrect advice does not mean the company lacked constructive notice." *Id.* at 644–45.

notice of the seller's undisclosed withdrawal liability." *OBZ, Inc.*, 348 F. Supp. 3d at 647 (citing *Heavenly Hana*, 891 F.3d at 847). Thus, for instance, in *Northwest Administrators, Inc. v. Santa Clarita Convalescent Corp.*, No. C17-1001RSL, 2018 WL 5886454 (W.D. Wash. Nov. 9, 2018), although there was no dispute as to the "substantial continuity" factor, the court found no actual or constructive notice. In that case, the successor entity and its principal had no previous experience in purchasing, owning or operating an entity with a unionized labor force or one that participated in a multiemployer pension plan. *Id.* at *1. Because the purchasing entity was "unfamiliar with the concept of withdrawal liability," the mere fact that the seller had disclosed the existence of a collective bargaining agreement did not "support a finding of actual notice of potential withdrawal liability," because "a collective bargaining agreement can exist separately from any obligation to fund employee pension or benefit plans and, even if such a plan exists, withdrawal liability does not automatically arise when an employer sells the assets of the business." *Id.*

The plaintiff also argued that the purchaser had constructive notice, that is, that its knowledge of the existence of the collective bargaining agreement gave rise to a duty to investigate further to determine whether the predecessor company "was participating in a multi-employer pension plan and whether withdrawal liability could be triggered by the transaction." *Id.* at *2. The court articulated the standard thus: "A constructive knowledge standard is not the same as strict liability: withdrawal liability will transfer to a successor only if (a) the purchaser, using reasonable care or diligence, would have discovered the withdrawal liability and (b) imposition of liability would be fair given the circumstances." *Id.* The court found, under the circumstances presented there—including the relative lack of sophistication of both the purchaser and its principal, the fact that the purchaser was not assuming any obligations under the collective bargaining agreement,

and the seller's express representations that it was not participating in any benefit plans—that withdrawal liability under these circumstances would be fundamentally unfair. *Id.*

On its facts, this case is closer to *OBZ, Inc.* than to *Santa Clarita Convalescent*: the defendants were clearly on notice that WIU's workforce was unionized and operating under a collective bargaining agreement. They were also aware that the collective bargaining agreement required contributions to the multiemployer pension plan, as they re-engaged the same employees under a separate collective bargaining agreement and began making contributions to the Fund in February 2018, immediately after closing on the APA. DeBusk employed its unionized workforce through G&A, as a result of which both defendants appear to have been fairly sophisticated with regard to multiemployer pension plans and interacting with a unionized labor force. In addition, although the APA itself is a brief, uncomplicated document, the apparent intent of the parties appears to have encompassed more than a simple transfer of tangible assets, as evidenced by the creation of the WIU division of DeBusk, the employment of Poteet by G&A, and G&A's assumption of WIU's employees and customers. Certainly the defendants hoped that Poteet would bring in additional customers, an expectation he apparently did not fulfill. Regardless, under all of the circumstances presented here, the court finds that the evidence in the record is sufficient to create a material factual dispute as to the reasonableness of the defendants' failure to investigate the possibility that WIU was delinquent in its contributions to the Fund.

## IV. CONCLUSION

For the reasons set forth herein, the court will deny the Motion for Summary Judgment. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge